Jeffrey N. Goldberg (SBN 217555)
jeff@jeffreyngoldberglaw.com
THE LAW OFFICES OF JEFFREY N. GOLDBERG, P.C.
11601 Wilshire Blvd., Ste 500
Los Angeles, California 90025
Tel.: (310) 765-2988
Fax: (310) 943-2765

Attorney for Plaintiffs
Crypto Asset Fund, LLC and
Digital Capital Management, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CRYPTO ASSET FUND, LLC, a Delaware limited liability company, and DIGITAL CAPITAL MANAGEMENT, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>OPSKINS GROUP INC., a Canadian company dba WORLDWIDE ASSET EXCHANGE; EXPOSITION PARK HOLDINGS SEZC, a Cayman Islands corporation, WILLIAM QUIGLEY, an individual; JONATHAN YANTIS, an individual; JOHN BRECHISCI, JR., an individual; MALCOLM CASSELLE, an individual; and DOES 1-10, inclusive,<br><br>Defendants. | **CASE NO.: 2:19-cv-06983**<br><br>**COMPLAINT FOR:**<br><br>**(1) VIOLATIONS OF THE SECURITIES ACT OF 1933; (2) VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934; (3) UNFAIR BUSINESS ACTS OR PRACTICES; (4) UNLAWFUL BUSINESS ACTS OR PRACTICES; (5) FRAUDULENT BUSINESS ACTS OR PRACTICES; (6) BREACH OF CONTRACT; (7) BREACH OF THE COVENANT OF GOOD FAITH & FAIR DEALING; (8) UNJUST ENRICHMENT; (9) CONVERSION; (10) PROMISSORY ESTOPPEL; (11) FRAUD; AND (12) NEGLIGENT MISREPRESENTATION**<br><br>**JURY TRIAL DEMANDED** |

## JURISDICTION

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, 15 U.S.C. § 77v, and 15 U.S.C. § 78aa because Plaintiffs allege violations of the Securities Act of 1933 and Securities Exchange Act of 1934.

2. This Court has personal jurisdiction over Defendants because Defendants either conduct business in this District or are present in this District for jurisdictional purposes. Defendants have sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. Defendants solicited investors in this District to purchase WAX tokens and obtained money or valuable cryptocurrency from those investors and Defendants solicit consumers in this District to utilize their platform and services.

3. Defendants have purposefully availed themselves of the benefits of operating in this jurisdiction, and this Court may exercise personal jurisdiction over Defendants.

## NATURE OF THE ACTION

4. Plaintiffs bring this action against Defendants for their violations of the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), and California's Unfair Competition Law and for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, conversion, promissory estoppel, fraud, and negligent misrepresentation.

5. Plaintiffs seek compensatory damages, including lost profits, restitution, disgorgement of profits, pre- and post-judgment interest at the statutory legal rate of 10% pursuant to Section 3289(b) of the California Civil Code, awards of costs and attorneys' fees pursuant to Section 1021.5 of the California Civil Code, and punitive damages in an amount sufficient to punish and deter Defendants.

6. Plaintiffs also seek injunctive relief to enjoin Defendants' unfair, unlawful, and fraudulent business acts and practices, including (1) an order

prohibiting Defendants from continuing to offer and sell unregistered, non-exempt securities, (2) an order prohibiting Defendants from engaging in any activities that promote or facilitate in any way, directly or indirectly, online gambling, and (3) an order declaring that Defendants' purported pre-dispute arbitration agreements with OPSkins and WAX users are invalid, unconscionable, and unenforceable and prohibiting Defendants from enforcing, seeking to enforce, or in any way relying upon such purported agreements.

## PARTIES

7. Plaintiffs Crypto Asset Fund, LLC and Digital Capital Management, LLC are Delaware limited liability companies with members who reside in California. In October 2017, Plaintiffs invested in Worldwide Asset eXchange ("WAX") tokens by causing to be electronically transmitted a total of 1.2 million U.S. dollars' worth of Ether cryptocurrency through or to Defendants in exchange for WAX tokens.

8. Plaintiffs are informed and believe that Defendant OPSkins Group Inc. dba Worldwide Asset eXchange ("OPSkins") is a Canadian Company with the registered address of 1200 McGill College Avenue, Montréal, Québec, H3B4G71207 Canada. Plaintiffs are further informed and believe that OPSkins operates out of offices located at 1207 4th Street, Suite 400B, Santa Monica, California 90401.

9. Plaintiffs are informed and believe that Exposition Park Holdings SEZC ("EPH") is a Cayman Islands Company with the registered address of Floor 4 Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands. Plaintiffs are further informed and believe that EPH operates out of offices located at 1207 4th Street, Suite 400B, Santa Monica, California 90401. According to OPSkins' Terms of Service, effective October 31, 2018, OPSkins became a tradename of EPH. According to WAX's Terms of Service, EPH provides WAX's products and services.

10. Defendant William Quigley is an individual who, upon information and belief, resides and does business in California. He is the CEO and Co-Founder of WAX which was developed by OPSkins of which Quigley is also the CEO. Quigley knowingly and actively participated in the offer and sale of WAX tokens to investors including Plaintiffs.

11. Defendant Jonathan Yantis is an individual who, upon information and belief, resides and/or does business in California. He is the COO of OPSkins. Yantis knowingly and actively participated in the offer and sale of WAX tokens to investors including Plaintiffs.

12. Defendant John Brechisci, Jr. is an individual who, upon information and belief, resides and/or does business in California. He is the CTO and Founder of OPSkins. Brechisci, Jr. knowingly and actively participated in the offer and sale of WAX tokens to investors including Plaintiffs.

13. Defendant Malcom CasSelle is an individual who, upon information and belief, resides and/or does business in California. He is the CIO of OPSkins and President of WAX. CasSelle knowingly and actively participated in the offer and sale of WAX tokens to investors including Plaintiffs.

14. Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as Does 1 – 10 and therefore sue said Defendants by such fictitious names. Plaintiffs will amend this Complaint to allege the true names and capacities when the same has been ascertained. All of the Doe Defendants and each of them were the agents and principals of all of the other defendants and were acting in the course and scope of their authority and in concert with one another.

## VENUE

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391, 15 U.S.C. § 77v, and 15 U.S.C. § 78aa because: (a) the conduct at issue took place and had an effect in this judicial District; (b) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District; and (c) Defendants have received

substantial compensation and other transfers of money by transacting business in this District and engaging in activities that have an effect in this District.

## FACTUAL ALLEGATIONS

16. OPSkins claims to be the world's largest platform for video game virtual goods traders. WAX – which stands for Worldwide Asset eXchange – describes itself as "[t]he safest and most convenient way to create, buy, sell, and trade physical and virtual items" and is reportedly one of the more active blockchains in the world.

17. OPSkins and WAX are effectively one in the same, run by an Executive Team comprised of William Quigley, Jonathan Yantis, John Brechisci, Jr., and Malcolm CasSelle (collectively, the "Executive Team").

18. OPSkins and WAX regularly hold themselves out publicly as based in Los Angeles and Santa Monica, California in press interviews and public appearances. However, neither OPSkins Group Inc. nor Exposition Park Holdings SEZC (collectively, the "Corporate Defendants") is properly registered with the California Secretary of State to do business in the State of California. The Corporate Defendants likewise do not properly hold business licenses with the City of Santa Monica.

19. The services and platforms provided by OPSkins and WAX are used to promote and facilitate underage and other illegal online gambling. In fact, Defendants run a massive online gambling operation with seemingly little if any independent oversight or regulation.

20. OPSkins and the Executive Team devised the WAX platform and token to facilitate and further their highly profitable online gambling operations and to fraudulently raise tens of millions of dollars from investors by offering and selling unregistered, non-exempt securities in violation of federal and state law.

21. On July 25, 2017, the Securities and Exchange Commission ("SEC") issued an investigative report (commonly referred to as the "Dao Report")

cautioning market participants that offers and sales of digital assets conducted by organizations using distributed ledger or blockchain technology are subject to the requirements of the federal securities laws. The SEC explained that "[s]uch offers and sales, have been referred to, among other things, as 'Initial Coin Offerings' or 'Token Sales.'"[1]

22. In the summer of 2017, on the heels of the SEC's issuance of the Dao Report, Defendants launched an aggressive private and public campaign to market their planned initial coin offering of the WAX token which would be accompanied by an industry standard "Whitepaper" describing the WAX platform and token to potential investors. Defendants released numerous versions of Whitepapers for WAX in 2017 and 2018. These Whitepapers were neither independently nor objectively prepared – they were specifically designed to persuade the investing public to provide the necessary capital to make Defendants' WAX platform and token concept possible and to enrich Defendants personally at the expense of the investing public.

23. Before holding their public initial coin offering in November 2017, Defendants held an invitation only private pre-sale beginning in October in which Plaintiffs participated. Some of the tokens purchased by early investors were subject to "lock up" periods while the other tokens would be subject to the initial release and distribution. Defendants later announced that the pre-sale was oversubscribed and had raised $21 million. Defendants then conducted their public pre-sale (for example, OPSkins customers were offered the opportunity to purchase tokens at a 50% "discount" from the pre-sale price) and finally a "General Audience Main Sale."

24. Defendants raised a staggering amount of money through their illegal offer and sale of WAX tokens. In an article published on January 1, 2018 by

---

[1] https://www.sec.gov/news/press-release/2017-131

Business Insider regarding "The 11 biggest ICO fundraises of 2017," it was reported that Defendants were the tenth largest ICO of 2018 with a fundraise of ***$68 million***.[2] However, in a November 30, 2017 press release, Defendants claimed that they raised "***over $80 million***" from "thousands of participants" in their token sale.[3] OPSkins CEO and WAX President Malcom CasSelle later claimed in a July 18, 2018 article by PC Games Insider that in 2017 Defendants "raised over ***$150 million*** to launch the WAX platform." CasSelle also claimed that "OPSkins is 10 or 20 times bigger than [their] nearest competitor . . ."[4]

25. To promote their token sale, Defendants developed a "One Pager" teaser featuring a prominently displayed declaration from OPSkins CEO William Quigley that "WAX WILL BECOME THE ONRAMP FOR MASS MARKET CRYPTOCURRENCY ADOPTION." Asking "What is WAX?", the One Pager claims that "***400M*** Gamers currently trade ***billions*** of virtual items each month." (Emphasis added). Turning next to the "Market Opportunity," the One Pager proclaims that these "[o]ver ***400M*** gamers purchase close to ***$50B*** in virtual items annually." (Emphasis added). OPSkins declares itself "the ***world's #1*** centralized marketplace for trading video game 'virtual' items" (emphasis added) while the One Pager touts the credentials of the Executive Team with references to prominent names like Disney, Harvard, and Stanford and a claim that the "OPSkins team" has "20 years AND BILLIONS OF TRANSACTIONS of virtual item experience." (Emphasis in original).

---

[2] https://www.businessinsider.com/the-10-biggest-ico-fundraises-of-2017-2017-12#7-qash-106-million-5

[3] https://markets.businessinsider.com/news/stocks/wax-completes-token-sale-to-decentralize-online-gaming-skins-marketopskins-backed-project-onboards-gamers-to-cryptocurrency-attracting-over-80-million-from-thousands-of-participants-1010047604

[4] https://www.pcgamesinsider.biz/feature/67458/why-opskins-is-okay-destroying-its-own-business-with-the-blockchain/

26. Defendants also developed and marketed a much more robust 11-page "Deck" detailing the investment opportunity presented by the WAX token sale scheduled for the fall of 2017.

27. On December 18, 2017, WAX published a list of "Top 10 Reasons to Get WAX Tokens" on medium.com in which Defendants proclaimed that they were "Trading the Most Popular Items in the World" and touted what a great investment opportunity they were offering since they were "Targeting an Existing Market" – a "Giant Ecosystem" supported by WAX – with a "Real and Needed Use Case" for WAX tokens.[5]

28. According to the publication, Defendants are a "Remarkable Team" of "HIGHLY RESPECTED" "Blockchain Development Experts" with "Deep Roots in the Crypto Community" who operate "the #1 digital marketplace in the world" where they "sell 2 million digital items PER WEEK." *Id.* (emphasis in original) Defendants pointed to their "History of Business Success," claiming that "WAX will be the 3rd global marketplace built by the OPSkins team. The first two became #1 in their respective categories (virtual items, skins)." *Id.* Defendants asserted "Market Dominance," claiming that "OPSkins is a ***multi-billion dollar business*** with ***millions of customers*** who love it (9.8/10 Trust Pilot rating). They created WAX because they know exactly what their ***400 million*** global digital item trading community wants." *Id.* (emphasis added).

29. Defendants systematically and deliberately lured investors, including Plaintiffs, under false pretenses to invest in WAX through the unregistered offering and sale of non-exempt securities.

30. In addition to failing to disclose to the investing public that they were offering and selling unregistered, non-exempt securities which bore massive risk of principal loss in violation of federal and state law, Defendants deliberately withheld

---

[5] https://medium.com/wax-io/top-10-reasons-to-get-wax-tokens-4b0ea8a88dfa

material information from investors, including Plaintiffs, regarding the true and complete nature of their business operations, including the use of their platform and services for underage and other illegal online gambling.

31. For example, CasSelle represented to Plaintiffs that the $50B number in the One Pager was based upon "extensive analysis" and claimed that OPSkins is "the largest ***providing cash payouts*** and 10x larger than the next competitor." (Emphasis added). CasSelle represented that OPSkins' annual revenue is "substantial and very profitable." After identifying Steam Marketplace as the "largest major player" other than OPSkins, CasSelle again emphasized that "***they don't cash out***. They just provide credit you can only use on Steam. They do ***many billions of dollars***." (Emphasis added). CasSelle and all the Defendants failed, however, to explain the significance of that distinction: To run a successful and profitable online gambling operation, users need to be able to realize their potential gambling profits in the form of cash rather than be stuck with using such proceeds only within the application itself.

32. Another tool Defendants use to maximize profits from gambling is restricting users' ability to withdraw money they have put into their accounts. As explained on the OPSkins blog, "as with all other payment methods, you can only withdraw WAX tokens that you earned from item sales – you cannot withdraw WAX Tokens that you deposited." The blog again reminds users that "you can only withdraw or cashout funds earned from item sales."[6] Put differently, you can only cash out gambling winnings, not the initial "seed" money you deposited to gamble. This is key of course because it forces users to either make a profit or gamble away the entire amount deposited, making it more likely that they may make a subsequent deposit in an effort to "win back" some of their losses. This is how the cycling of

[6] https://blog.opskins.com/can-now-use-wax-tokens-opskins/

gambling addiction begins and continues.[7] This is how Defendants make millions of dollars.

33. That the WAX platform and the WAX token were developed for the specific purpose of facilitating Defendants' online gambling operations generally and to facilitate cash payouts for Defendants' gambling customers specifically are material facts that should have been disclosed to potential investors including Plaintiffs. Obviously running an online gambling operation presents huge regulatory and other risks that could materially impact the value of the WAX token should Defendants ever fall under regulatory scrutiny or investigation or become the subject of an enforcement action. Additionally, Defendants' participation in online gambling operations might understandably render investments in WAX tokens outside of investor guidelines and therefore likely would have significantly hampered Defendants' ability to raise funds from institutional investors and others.

34. Defendants also withheld material information regarding the process by which tokens would be released and distributed to investors, including regarding their lack of general preparedness for the release and their plan to selectively distribute tokens to certain, preferred investors on a staggered basis, enabling those favored investors to potentially – and ultimately actually – realize the most significant profits at the expense of other investors like Plaintiffs.

35. Indeed, Defendants knew and understand that for early investors like Plaintiffs timing was key. Defendants knew and understood that investors like Plaintiffs who intended to employ a "get in early, get out early" investment strategy

[7] According to the California Council on Problem Gambling – "a non-profit organization, founded in 1986, dedicated to assisting problem gamblers and their families by promoting awareness, education, research, prevention and treatment for problem gambling" – gambling addiction is a serious problem that afflicts youth, teens, and adults and "can affect all elements of a person's life: social, academic, professional (work), and personal." https://calpg.org/about-us/ & https://calpg.org/what-is-gambling-addiction/

whereby they would buy at a discount at the hopes of selling at a premium once trading began on the open market cannot work if you are unable to execute on the "get out" half of the strategy at the critical time because you do not have your tokens.

36. Defendants admitted in a post on medium.com that after deciding to start "the token distribution process a week and a half early," it was plagued with problems and "taking longer than expected." Other serious issues included a last minute "10 to 1 split" whereby Defendants released 1,8500,000,000 tokens instead of the originally planned 185,000,000. When exchange Huobi Pro listed the WAX token supply as the original number (one tenth of the true supply), mass confusion ensued.[8]

37. While Defendants began releasing tokens to certain investors on or before December 19, 2017, Defendants did not release Plaintiffs' tokens until four days later. During this time, Plaintiffs watched the price of a WAX token peak at over $5 while other favored investors realized millions of dollars in profits of which Plaintiffs were deprived due to Defendants' failure and refusal to timely release the tokens they had purchased.

38. Plaintiffs communicated extensively with Defendants during these crucial days. Plaintiffs were understandably frustrated and desperate to obtain their tokens, an obviously necessary prerequisite to their ability to maximize profits. Defendants' acts and omissions cost Plaintiffs millions of dollars in lost profits.

39. In an April 30, 2018 "Insider Spotlight" on OPSkins' CEO William Quigley on builtinla.com — the self-described "hub for LA startups + tech", Quigley admitted that OPSkins was "targeting a large and fast-growing market" with the "explosion of blockchain-based tradeable assets" and quipped about how easily companies have been able to raise money by launching ICOs instead of

---

[8] https://medium.com/wax-io/wax-update-december-24-2017-8db1b1a9fee2

"going the venture capital route."[9] Of course Defendants preferred to raise tens of millions of dollars from investors through an ICO because it costs them very little in comparison to create a virtual "token" and they only need provide various quantities of the token (the supply of which they control entirely) to investors in exchange for their money. Of course, the cash raised by Defendants is then insulated from fluctuations and potential declines in the value of the token on a going forward basis while investors are left to bear the brunt of market forces. And bear the brunt they did – WAX tokens are currently worth only pennies at a mere fraction of what most investors paid.

40. On March 13, 2018, Defendants published a "Project Update 1" regarding WAX. Defendants contended that "Crypto + virtual item marketplaces" were "on the rise," claiming that "[m]ore than $500 million has been raised by projects in th[e] space over the part few years." Claiming that there has been "strong year-over-year growth in revenue from companies like OPSkins," Defendants continued to aggressively target potential investors and users by declaring that "it's clear that money will continue to flow into this category." Defendants declared OPSkins "clearly the dominant player" in the field, "outperforming all others."[10]

41. In June 2018, OPSkins received a cease and desist order from Valve, the developer of Steam, shortly after Defendants' launch of the WAX ExpressTrade. In 2011, Steam had added a feature whereby users could trade in-game items. Users could not, however, turn those items into actual money and Steam's terms of service expressly prohibited its use to promote or facilitate gambling. Valve concluded that Defendants' ExpressTrade service violated Valve's Subscriber Agreement terms and constituted an unauthorized use of Valve's intellectual property for commercial

[9] https://www.builtinla.com/2018/04/30/OPSkins-Leadership-Spotlight

[10] https://medium.com/wax-io/worldwide-asset-exchange-project-update-1-56f6f893eb32

purposes because it enabled users to gamble with skins and then turn any gambling winnings into real-world money. Defendants developed and launched WAX for this specific purpose. Why? According to Esports Insider, which describes itself as "[o]ne of the leading esports industry focused platforms worldwide," unregulated "skin gambling is projected to generate ***$50b (£35.3b)*** by 2022."[11]

42. The Esports Insider's take on Valve's response to WAX's ExpressTrade was as follows: "In-game skin trading has been an attractive feature for CS:GO, players, since its introduction ***but as it opens up the market for unregulated trading and gambling*** Valve has to enforce strict rules along with cease and desist orders just like this. Some may think this is actually harmful to the CS:GO and Steam communities but as the environment is heavily unregulated Valve has no choice." *Id.* (emphasis added).

43. Indeed, in an article dated November 6, 2018 on the website BlockchainGamerBiz, which describes itself as being "dedicated to illuminating and explaining the world of blockchain technology as applied in the games space," the author explained that WAX launched a "test case application, which is effectively its version of Counter-Strike: GO skin ***gambling***, in which ***users buy keys to open cases in the hope of randomly winning more valuable items than the key cost them***."[12] The case opening process is the virtual equivalent of watching a slot machine spin in a casino.

44. In response to Valve's cease and desist order, OPSkins took to the internet – specifically the OPSkins blog at blog.opskins.com – to defend itself. OPSkins was quick to advertise that while Valve "does not allow cashouts," "OPSkins has offered this since day one." OPSkins also touted its lower commission rates and the fact that it had no maximum price for the trading of virtual

[11] https://esportsinsider.com/2018/06/valve-opskins/ (emphasis added)

[12] https://www.blockchaingamer.biz/news/7258/wax-delays-mainnet-launch/ (emphasis added)

items while Valve had a $2,000 price cap.[13] OPSkins admitted in its blog that WAX was "built to support a post-Valve trading economy" and that "Valve's decision was not unexpected."

45. On July 23, 2018, Defendants posted a "Project Update 2" regarding WAX which consisted of both a video interview of OPSkins and WAX CEO William Quigley and an accompanying written transcript. In the interview, after noting how much Defendants "like being in downtown Santa Monica" after the interviewer commented on how "wonderful" Defendants' "office space" is, Quigley was prompted to pitch why WAX's token offering was supposedly different than others who are "just like throwing some money online and being like, oh I've made money somehow."[14] Spoiler alert: WAX isn't different. Defendants effectively treated and used the ICO process as a license to print money. It was a money *pit* for investors, however. On the other hand, as the interviewer joked, from Defendants' perspective "I know everyone was like, we're going to be rich . . ." *Id.*

46. In describing his "grand vision" for WAX as a "global platform," Quigley throws around comparisons to the Apple App store and Google Play, characterizing OPSkins as "an ebay for virtual goods" and explaining that Defendants "created the WAX ExpressTrade specifically to enable virtual items to be traded easily, at very low cost, conveniently." *Id.* In reality, Defendants created WAX and the WAX token for two key reasons: to raise tens of millions of dollars through an illegal securities offering and to facilitate Defendants' aspirations of building a highly profitable global, online gambling operation.

47. In the interview, Quigley claims that "[t]he number of transactions that are taking place with VGO for instance, make it the top DApp, distributed

---

[13] https://blog.opskins.com/official-statement-regarding-valve-opskins-steam-accounts/

[14] https://medium.com/wax-io/worldwide-asset-exchange-q2-project-update-6664fb77ec83

application, on Ethereum." *Id.* VGO and vIRL are gambling sites or applications. In fact, if you Google "vgo virl" the top results direct you to the "Best vIRL and VGO ***Gambling*** Sites in 2019" and the "Best VGO and vIRL ***Gambling*** Sites in 2019." (Emphasis added). Gaming publication Polygon even featured an article on March 4, 2019 about how WAX is bringing gambling to users' computers around the world.[15]

48. In a post on the WAX website, Defendants proclaim that "[v]ideo game customers spending $100+ billion per year on virtual items are painting a clear picture of the future of retail." Defendants then argue that Twitch and YouTube streamers "giving away merchandise or selling it" "reveal immediately that customers overwhelmingly love digital goods" and "want to trade them, share them and sell them, quickly and easily."[16] Companies like Defendants "sponsor" these streamers with large followings (*i.e.*, pay them) to promote their gambling operations, showcasing things like mystery item unboxing and case battles where users gamble with the house or each other.

49. On February 12, 2019, when a user credited and thanked OPSkins and WAX for making gambling available on a message board, WAX responded "Thank you for the kind words!" followed by a heart emoji.

50. Defendants specifically marketed their platform and services to California consumers and investors. Indeed, both OPSkins' and WAX's terms of service have special Notices for California Users. WAX's Notice even specifically directs communications to ***underage users in California***, stating: "***If you are a California resident under the age of 18***, and a registered user of any site where this policy is posted, California Business and Professions Code Section 22581 permits

---

[15] https://www.polygon.com/2019/3/4/18246712/real-life-loot-boxes-wax-virl-itemunbox-gambling

[16] https://wax.io/blog/the-wax-platform-invites-a-post-retail-world

you to request and obtain removal of content or information you have publicly posted. . . . ."[17]

51. OPSkins' and WAX's terms of service also purport to require users to arbitrate any disputes relating to their products and services in the Cayman Islands.[18] Defendants' purported pre-dispute arbitration agreements, however, are unconscionable and neither valid nor enforceable.

52. In April 2019, Defendants began rolling out announcements on the WAX website regarding the upcoming launch of the WAX Blockchain Mainnet and a "WAX Token Swap" which had been delayed approximately a year from the promised rollout in the second half of 2018. Referring to the token swap process as a supposedly "fair coin distribution mechanism," Defendants explained that, in order to accommodate the WAX Blockchain Mainnet, holders of the original ERC-20 WAX tokens would have a two-month period from June 30 to August 30, 2019 to swap those tokens for the new WAX Protocol Tokens.

53. In other words, Defendants have doubled down following their initial illegal securities offering with a second one. And, to boot, if purchasers of the original tokens fail for any reason to swap their tokens during this two-month period, their tokens will then truly be rendered worthless since the WAX website provides that once the WAX Token Swap has ended on August 31, 2019, "ERC-20 WAX Tokens will no longer be converted to WAX Protocol Tokens."[19]

54. Defendants also introduced the Genesis Block Member Program and numerous other complex concepts including the "burning" and "staking" of tokens and the ability to earn tokens as rewards, concepts which Defendants admit could have deflationary or inflationary effects on the fluctuating value of a WAX token.

---

[17] https://opskins.com/tos.html & https://wax.io/zh/tos (emphasis added)

[18] *See id.*

[19] https://wax.io/blog/a-look-ahead-wax-in-q3-2019

To date, Defendants have essentially been left to their own devices to just "go with the flow" – presently in the process of manipulating the supply and therefore ultimately price of a WAX token – as they see fit without appropriate oversight and regulation.

55. On or about April 11, 2019, the SEC released a "Spotlight on Initial Coin Offerings (ICOs)" in which it noted that "[c]ompanies and individuals are increasingly considering initial coin offerings (ICOs) as a way to raise capital or participate in investment opportunities" which "bring increased risk of fraud and manipulation because the markets for these assets are less regulated than traditional capital markets." Among the "5 things you need to know about ICOs" per the SEC were the fact that "ICOs can be securities offerings," "they may need to be registered," and "ICOs may pose substantial risks." The SEC also reiterated its position set forth in the Dao Report: "As SEC Chairman Jay Clayton has stated, tokens and offerings that feature and market the potential for profits based on the entrepreneurial or managerial efforts of others contain the hallmarks of a security under U.S. law."[20]

56. On June 4, 2019, the SEC sued Kik Interactive Inc. ("Kik") – launched by the creators of once popular social media app Kik – for conducting an illegal $100 million securities offering of the Kin digital tokens. As noted above, on the first day of 2018, Business Insider published an article on "The 11 biggest ICO fundraises of 2017." WAX ranked tenth, two behind Kin at eighth place with its reported $98 million fundraise.[21] The SEC charged that Kik sold the tokens to U.S. investors without registering their offer and sale as required by the U.S. securities laws because it was desperate to keep from running out of money.[22] Indeed, Kik

[20] https://www.sec.gov/ICO

[21] https://www.businessinsider.com/the-10-biggest-ico-fundraises-of-2017-2017-12#7-qash-106-million-5

[22] https://www.sec.gov/litigation/litreleases/2019/lr24493.htm

would not have survived nearly as long as it did but for the money raised through its illegal ICO.

57. Just like Kik, Defendants similarly raised tens of millions of dollars from California and other U.S. investors through their illegal securities offering of WAX tokens without registering their offer and sale as required by the U.S. securities laws. Likewise, the WAX platform and services would have never been rolled out and functioning as they are today without the illegal securities offering and sale conducted by Defendants.

58. Among other indicia of a securities offering, Defendants touted that the WAX tokens received in exchange for investors' investments would be worth more than the moneys they paid. Additionally, Defendants created a sense of urgency for investors including Plaintiffs to make their investments to capitalize on the profit potential of the investment. Defendants also publicly refer to token holding as "ownership" – another hallmark of a security.[23] Just as more traditional securities are listed on exchanges like NYSE and NASDAQ, WAX tokens are listed on various cryptocurrency exchanges such as Huobi, Bibox, EtherDelta, Bancor Network, and Tidex.

59. The Securities Act's and the Exchange Act's requirements are designed to protect investors by ensuring that they are provided adequate, truthful, and materially complete information upon which to base their investment decisions. California's Unfair Competition Law is an important law enforcement tool designed to protect consumers from unfair, unlawful, and fraudulent business acts and practices and to deter and punish wrongdoing.

60. The initial WAX token price was $0.50. When open trading began on the secondary markets in December 2017, the price quickly peaked at just over $5.00 per token during which time certain investors and/or insiders were given

[23] https://wax.io/blog/how-can-an-increasing-wax-token-supply-lead-to-deflation

preferential treatment through the early, limited release of tokens to the detriment of other investors like Plaintiffs who were deprived of millions of dollars in lost profits because of Defendants' failure and refusal to timely release their tokens. The WAX token's value quickly fell dramatically to mere cents where it remains today, currently worth less than $0.06, yielding a return on investment of ***negative 70%*** from the initial token price. On the other hand, Defendants have enriched themselves to the tune of ***tens of millions of dollars*** at the expense of investors and consumers.

61. Through this action, Plaintiffs seek relief for themselves, to protect California consumers, and to deter and punish Defendants' wrongdoing.

## CLAIMS ALLEGED

### COUNT 1
**Violation of the Securities Act (15 U.S.C. § 77l(a)(2))**
**(Against all Defendants)**

62. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

63. The Securities Act prohibits the offer and sale of a security by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

64. The Securities Act grants Plaintiffs a private right of action for damages against Defendants for their violations of this provision.

65. In marketing the WAX token to prospective investors, including Plaintiffs, Defendants unlawfully made use of means or instruments of transportation or communication in interstate commerce or of the mails or by means of a prospectus or oral communication to make an untrue statement of material fact

and/or omitted to state a material fact necessary in order to make their statements, in light of the circumstances they were made, not misleading.

66. Defendants "offered" and "sold" securities within the meaning of the Securities Act because Defendants solicited Plaintiffs' and others investments in WAX Tokens, actively and knowingly participated in the offer and sale of WAX Tokens to Plaintiffs and others, and/or offered or sold WAX Tokens they held or controlled to Plaintiffs.

67. By reason of the foregoing, Defendants have violated 15 U.S.C. §§ 77l(a)(2).

68. Defendants' violation of the Securities Act was a substantial factor in causing Plaintiffs damages in connection with their purchases of WAX Token securities. As such, Defendants are liable to Plaintiffs for compensatory damages.

**COUNT 2**
**Violation of the Securities Act (15 U.S.C. § 77o(a))**
**(Against all Individual Defendants)**

69. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

70. Section 15 of the Securities Act provides for joint and several liability for "controlling persons" who had sufficient power or influence over a person or entity that violated federal securities laws:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under section 77k or 77l of this title, shall also be liable jointly and severally with and to the same as extent as such

> controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a).

71. Defendant William Quigley is subject to liability by virtue of his top-level executive positions with OPSkins and WAX and his significant influence and supervisory authority over them. Quigley is a Co-Founder of WAX and serves as its Chief Executive Officer, which provided him the power to control or influence the actions of WAX and persons affiliated with WAX. Quigley is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

72. Defendant Jonathan Yantis is subject to liability by virtue of his top-level executive positions with OPSkins and WAX and his significant influence and supervisory authority over them. Yantis is the COO of OPSkins and WAX, which provided him the power to control or influence the actions of WAX and persons affiliated with WAX. Yantis is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

73. Defendant Jonathan Brechisci, Jr. is subject to liability by virtue of his top-level executive position with OPSkins and his significant influence and supervisory authority over the company. Brechisci, Jr. is the CTO and Founder of OPSkins, which provided him the power to control or influence the actions of WAX and persons affiliated with WAX. Brechisci, Jr. is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

74. Defendant Malcolm CasSelle is subject to liability by virtue of his top-level executive position with OPSkins and his significant influence and supervisory authority over the company. CasSelle is the CIO of OPSkins and President of WAX, which provided him the power to control or influence the actions of WAX

and persons affiliated with WAX. CasSelle is a "controlling person" within the meaning of Section 15(a) of the Securities Act, 15 U.S.C. § 77o.

75. Defendants' roles as "controlling persons" of entities or persons who violated Section 15 of the Securities Act were a substantial factor in causing Plaintiffs damages.

**<u>COUNT 3</u>**
**Violation of the Securities Act (15 U.S.C. § 77q(a))**
**(Against all Defendants)**

76. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

77. The Securities Act prohibits the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77q(a).

78. Defendants unlawfully used interstate commerce and/or the mails to employ a device, scheme, or artifice to defraud purchasers of WAX tokens, to obtain money or property from those purchasers by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements they made, in light of the circumstances under which they were made, not misleading, and to engage in transactions, practices, and courses of business which operated and operate as a fraud or deceit upon the purchasers of WAX tokens.

79. By reason of the foregoing, Defendants have violated 15 U.S.C. §§ 77q(a).

80. Defendants' violation of the Securities Act was a substantial factor in causing Plaintiffs damages in connection with their purchases of WAX Token securities. As such, Defendants are liable to Plaintiffs for compensatory damages.

**COUNT 4**
**Violation of the Exchange Act (15 U.S.C. § 78j(b) & 17 CFR § 240.10b-5 )**
**(Against all Defendants)**

81. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

82. The Exchange Act prohibits the direct or indirect use of any means or instrumentality of interstate commerce or of the mails (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

83. Defendants knowingly and intentionally or recklessly used interstate commerce and/or the mails to employ a device, scheme, or artifice to defraud investors, to obtain money or property from investors by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements they made, in light of the circumstances under which they were made, not misleading, and to engage in transactions, practices, and courses of business which operated and operate as a fraud or deceit upon the purchasers of WAX tokens.

84. Plaintiffs reasonably relied to their detriment on the material misrepresentations made by Defendants and upon the expectation that Defendants would disclose all material facts relating to their potential and actual investment in

WAX tokens, including all material facts regarding Defendants' ability and plans to release WAX tokens to investors.

85. Defendants' lack of appropriate preparation for, failed execution of, and/or selective, advanced release of WAX tokens to certain favored investors proximately caused Plaintiffs damages, including millions of dollars of lost profits.

86. By reason of the foregoing, Defendants have violated 15 U.S.C. §§ 77q(a) and are liable to Plaintiffs for compensatory damages.

**COUNT 5**
**Violation of the Exchange Act (15 U.S.C. § 78t)**
**(Against all Individual Defendants)**

87. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

88. The Exchange Act provides for joint and several liability for "controlling persons" who had sufficient power or influence over a person or entity that violated federal securities laws:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.

89. Defendant William Quigley is subject to liability by virtue of his top-level executive positions with OPSkins and WAX and his significant influence and

supervisory authority over them. Quigley is a Co-Founder of WAX and serves as its Chief Executive Officer, which provided him the power to control or influence the actions of WAX and persons affiliated with WAX. Quigley is a "controlling person" within the meaning of the Exchange Act, 15 U.S.C. § 78t.

90. Defendant Jonathan Yantis is subject to liability by virtue of his top-level executive positions with OPSkins and WAX and his significant influence and supervisory authority over them. Yantis is the COO of OPSkins and WAX, which provided him the power to control or influence the actions of WAX and persons affiliated with WAX. Yantis is a "controlling person" within the meaning of the Exchange Act, 15 U.S.C. § 78t.

91. Defendant Jonathan Brechisci, Jr. is subject to liability by virtue of his top-level executive position with OPSkins and his significant influence and supervisory authority over the company. Brechisci, Jr. is the CTO and Founder of OPSkins, which provided him the power to control or influence the actions of WAX and persons affiliated with WAX. Brechisci, Jr. is a "controlling person" within the meaning of the Exchange Act, 15 U.S.C. § 78t.

92. Defendant Malcolm CasSelle is subject to liability by virtue of his top-level executive position with OPSkins and his significant influence and supervisory authority over the company. CasSelle is the CIO of OPSkins and President of WAX, which provided him the power to control or influence the actions of WAX and persons affiliated with WAX. CasSelle is a "controlling person" within the meaning of the Exchange Act, 15 U.S.C. § 78t.

93. As "controlling persons," Defendants proximately caused Plaintiffs damages, including millions of dollars of lost profits.

///

///

///

///

**COUNT 6**

**Unfair Business Acts or Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq*.) (Against all Defendants)**

94. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

95. The acts and practices of Defendants offend established public policy and/or are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Defendants therefore engaged in unfair business acts and practices within the meaning of Cal. Bus. & Prof. Code §§17200 *et seq.*

96. Defendants' unfair business acts or practices were a substantial factor in causing Plaintiffs to lose money or property in which they had a vested interest.

97. Plaintiffs are entitled to recover restitution and disgorgement of profits and seek injunctive relief to enjoin Defendants' unfair business acts and practices which are ongoing.

**COUNT 7**

**Unlawful Business Acts or Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq*.) (Against all Defendants)**

98. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

99. By violating various statutes, rules, and regulations, including without limitation those referenced above and 15 U.S.C. § 77e(a), 15 U.S.C. § 77e(c), and Cal. Corp. Code §§ 25100 *et seq*., Defendants engaged in unlawful business practices within the meaning of Cal. Bus. & Prof. Code §§17200 *et seq.*

100. Defendants' unlawful business acts or practices were a substantial factor in causing Plaintiffs to lose money or property in which they had a vested interest.

///

///

101. Plaintiffs are entitled to recover restitution and disgorgement of profits and seek injunctive relief to enjoin Defendants' unlawful business acts and practices which are ongoing.

**COUNT 8**
**Fraudulent Business Acts or Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq*.)**
**(Against all Defendants)**

102. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

103. Defendants business acts or practices were likely to deceive consumers and therefore Defendants engaged in fraudulent business practices within the meaning of Cal. Bus. & Prof. Code §§17200 *et seq.*

104. Defendants' fraudulent business acts or practices were a substantial factor in causing Plaintiffs to lose money or property in which they had a vested interest.

105. Plaintiffs are entitled to recover restitution and disgorgement of profits and seek injunctive relief to enjoin Defendants' unlawful business acts and practices which are ongoing.

**COUNT 9**
**Breach of Contract**
**(Against all Defendants)**

106. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

107. Pursuant to Defendants' offer to sell WAX tokens, Plaintiffs and Defendants entered into an agreement whereby Plaintiffs purchased WAX tokens from Defendants.

108. Plaintiffs did all, or substantially all, of the significant things that the agreement required or were excused from having to do so.

109. Defendants breached their obligations under the agreement, including without limitation their obligation to release the WAX tokens in a fair and timely manner that did not give certain investors preference over others.

110. Defendants' breach of contract was a substantial factor in causing Plaintiffs damages.

## COUNT 10
## Breach of the Covenant of Good Faith and Fair Dealing
## (Against all Defendants)

111. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

112. Under California law, every contract has an implied covenant of good faith and fair dealing which requires that the parties refrain from doing anything to unfairly interfere with the right of the other party to receive the benefits of the contract.

113. Defendants breached the covenant of good faith and fair dealing when they selectively distributed tokens to certain, preferred investors while failing and refusing to release Plaintiffs' tokens for days while other investors were able to take advantage of the opportunity to maximize profits.

114. Defendants' breach of the covenant of good faith and fair dealing was a substantial factor in causing Plaintiffs damages.

## COUNT 11
## Unjust Enrichment
## (Against all Defendants)

115. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

116. As a result of their failure and refusal to timely release Plaintiffs' tokens, Defendants have been unjustly enriched at the expense of Plaintiffs.

117. Plaintiffs are entitled to recover monies from Defendants to remedy such unjust enrichment.

**COUNT 12**
**Conversion**
**(Against all Defendants)**

118. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

119. Plaintiffs had a right to timely obtain and possess the WAX tokens at the same time as other investors.

120. Defendants intentionally and substantially interfered with Plaintiffs' WAX tokens by preventing Plaintiffs from having access to them.

121. Defendants did so without Plaintiffs' consent.

122. Defendants' conduct was a substantial factor in causing Plaintiffs harm.

**COUNT 13**
**Promissory Estoppel**
**(Against all Defendants)**

123. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

124. Defendants made a promise to distribute WAX tokens to Plaintiffs and other investors on a fair, non-preferential basis.

125. Defendants, however, did not intend to perform this promise when they made it.

126. Defendants intended that Plaintiffs rely on their promise.

127. Plaintiffs reasonably relied on Defendants' promise.

128. Defendants did not distribute WAX tokens to Plaintiffs and other investors on a fair, non-preferential basis.

129. Plaintiffs' reliance on Defendants' promise was a substantial factor in causing Plaintiffs harm.

**<u>COUNT 14</u>**
**Fraud**
**(Against all Defendants)**

130. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

131. Defendants had a duty to accurately and completely disclose material information to Plaintiffs regarding the potential investments in WAX tokens.

132. Defendants induced Plaintiffs to purchase WAX tokens by making material, false representations and/or omissions that Defendants knew to be false and/or materially incomplete or which were made recklessly without regard for their truth.

133. Defendants intended that Plaintiffs rely on their misrepresentations.

134. Plaintiffs reasonably relied to their detriment on the material misrepresentations made by Defendants and upon the expectation that Defendants would disclose all material facts.

135. Plaintiffs' reliance was a substantial factor in causing Plaintiffs damages. In addition to seeking compensatory damages, because of the malicious, oppressive, and fraudulent nature of Defendants' conduct, Plaintiffs also seek punitive damages in an amount sufficient to punish and deter Defendants.

**<u>COUNT 15</u>**
**Negligent Misrepresentation**
**(Against all Defendants)**

136. Plaintiffs repeat and re-allege each and every allegation above as if set forth herein.

137. Defendants induced Plaintiffs to purchase WAX tokens by making material misrepresentations and/or omissions for which they had no reasonable grounds to believe to be true and complete.

138. Defendants intended that Plaintiffs rely on their misrepresentations.

139. Plaintiffs reasonably relied to their detriment on the material misrepresentations made by Defendants and upon the expectation that Defendants would disclose all material facts.

140. Plaintiffs' reliance was a substantial factor in causing Plaintiffs damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment and relief as follows:

A. Declaring the sale of WAX tokens a security under the federal and state securities laws;

B. Declaring that Defendants offered and sold unregistered securities in violation of federal and state securities laws;

C. Declaring that Defendants are liable to Plaintiffs under the Securities Act, the Exchange Act, and California's Unfair Competition Law;

D. Awarding Plaintiffs compensatory damages, including lost profits;

E. Ordering Defendants to provide restitution and to disgorge profits to Plaintiffs;

F. Awarding Plaintiffs punitive damages in an amount sufficient to punish and deter Defendants;

G. Awarding Plaintiffs pre- and post-judgment interest at the statutory legal rate of 10% pursuant to Section 3289(b) of the California Civil Code;

H. Awarding Plaintiffs attorneys' fees pursuant to Section 1021.5 of the California Civil Code;

I. Awarding Plaintiffs the costs of this action;

J. Enjoining Defendants and each of them from continuing to offer and sell unregistered, non-exempt securities;

K. Enjoining Defendants and each of them from engaging in any activities that promote or facilitate in any way, directly or indirectly, online gambling;

L. Declaring Defendants' purported pre-dispute arbitration agreements with OPSkins and WAX users invalid, unconscionable, and unenforceable and enjoining Defendants and each of them from enforcing, seeking to enforce, or in any way relying upon such purported agreements; and

M. Ordering such other and further relief as may be just and proper.

DATED: August 12, 2019

Respectfully Submitted,

By: /s/ Jeffrey N. Goldberg

JEFFREY N. GOLDBERG
THE LAW OFFICES OF JEFFREY N. GOLDBERG, P.C.

Attorney for Plaintiffs
Crypto Asset Fund, LLC and
Digital Capital Management, LLC

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

DATED: August 12, 2019

Respectfully Submitted,

By: /s/ Jeffrey N. Goldberg

JEFFREY N. GOLDBERG
THE LAW OFFICES OF JEFFREY N. GOLDBERG, P.C.

Attorney for Plaintiffs
Crypto Asset Fund, LLC and
Digital Capital Management, LLC